**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Adegboyega Ayorinde Oladapo Oladipo AKINDELE, also known as Garland Crum; and Babatunde Lawal, also known as Keith Woolsey, also known as Donald Nowak, also known as Donald Clayton, also known as Alan Bott, Defendants–Appellants.**

Nos. 95–1582, 95–1583.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1995 *.

Decided May 23, 1996.

---

* The appeal of Akindele was argued on December 6, 1995; the *pro se* appeal of Lawal was submitted for decision on the briefs and record on the same date.

Barry Rand Elden, Chief of Appeals, Gregory Mitchell (argued), Office of the U.S. Atty., Crim. Appellate Div., Chicago, IL, for Plaintiff-Appellee.

John P. DeRose (argued), DeRose & Associates, Burr Ridge, IL, for Defendant-Appellant.

Before POSNER, Chief Judge, and WOOD, JR., and EVANS, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Adegboyega Ayorinde Oladapo Oladipo Akindele ("Akindele") and Babatunde Lawal ("Lawal") appeal the sentences imposed by the district court following their guilty pleas to charges of mail fraud, credit card fraud, bank fraud, aiding and abetting, and unlawful use of social security numbers. We affirm the sentences imposed by the district court.

## I. BACKGROUND

The intricate web of deceit and intrigue woven by Akindele and Lawal first began to unravel in October 1993, when Akindele was arrested for a traffic violation. The police officers on the scene noted that Akindele, who claimed that his name was Garland Crum, had numerous documents in his possession bearing different social security numbers and names. Shortly thereafter, on November 26, 1993, Akindele was arrested by federal officials as he attempted to execute a large withdrawal from an account that had been opened in the name of Garland Crum. Lawal was arrested on December 4, 1993, after officials investigating Akindele's fraudulent schemes established Lawal's involvement.

The fraudulent activities in question commenced shortly after Akindele first moved to Chicago from New York in the spring of 1990. Falsely claiming that he was indigent, Akindele used a variation of his name and a false social security number to begin receiving benefits from the Illinois Department of Public Aid. Using a different variation of his name and a different social security number, Akindele secured employment in the accounting department of the A.B. Dick Company a short while later. After working for a few months, Akindele quit his job in January 1991, allegedly for the purpose of receiving unemployment compensation. Akindele continued to employ false names and social security numbers to receive unemployment compensation and public assistance benefits up until the time of his arrest.

Lawal, whom Akindele had first met in Nigeria [1] several years before, moved to Chicago from New York around May 1992. Akindele and Lawal became reacquainted and eventually shared an apartment together. In June 1992, Akindele advertised that his "business," which he had recently incorporated under the name Addison Properties, Inc., was in the market to purchase mortgages. Akindele's ploy was successful, and he received numerous completed mortgage applications from a mortgage loan company. Akindele and Lawal used the social security numbers and other personal information contained in these mortgage applications to fraudulently obtain credit cards and bank loans and to open checking accounts. Akindele and Lawal then used these credit cards, lines of credit, and checking accounts to obtain cash, goods, and services.

Around this time, Lawal established a sham business of his own, the Hawthorne Brokerage Company, which Lawal and Akindele used to process further fraudulent credit card and loan applications. Akindele also used the Hawthorne Brokerage Company as a personal reference in order to obtain an apartment under a false name and Akindele then used this new mailing address to receive further credit cards and other loan documents.

Beginning in September 1992, Akindele began using the name and social security number of Garland Crum. Unlike the other names and social security numbers which they had obtained, Akindele and Lawal were careful to safeguard and enhance Crum's

---

1. Akindele, a resident alien, was born in London, England, to Nigerian parents; Lawal is a Nigerian national who is present illegally in the United States.

credit history.[2] Toward this end, Akindele and Lawal opened several bank accounts under the Crum name, into which they funneled much of their ill-gotten gains. The creditworthy Crum identity, and the several large bank accounts established under this name, were then used to secure further bank loans, including two car loans, personal loans, and a mortgage loan.

Akindele and Lawal were initially indicted on January 26, 1994, and February 3, 1994, respectively. On June 29, 1994, a thirty-five count superseding indictment was returned, following the failed efforts of Akindele and Lawal to negotiate a guilty plea. Lawal then moved for severance of the proceedings, and a second superseding indictment was returned shortly thereafter; the charges were reduced to twenty-one counts. The charges included mail, bank, and credit card fraud, aiding and abetting, and unlawful use of social security numbers.

After the defendants pleaded not guilty to the counts contained in the second superseding indictment, the district court set a trial date for October 3, 1994. Before this date, Akindele twice informed the court that he intended to plead guilty, but his offers were rejected because they failed to encompass the entire indictment. On October 3, 1994, the jury was impaneled.

The next day, Akindele and Lawal informed the court that they wished to plead guilty. After verifying that the defendants were willing to enter guilty pleas to the entire second superseding indictment, the district court accepted their pleas. The district court reviewed the nature of each of the counts, the defendants formally pleaded guilty, and sentencing was set for January 9, 1995.

In the interim, the U.S. Probation Office prepared a Presentence Investigative Report ("PSI") for each defendant. Both defendants objected to the government's loss calculations. In addition, Lawal raised several *pro se* objections to the PSI which seemed to contradict his earlier guilty plea. Following a 3-day hearing, the district court rejected the defendants' objections to the PSI and sentenced Akindele to 58 months imprisonment, 5 years of supervised release, 500 hours of community service, and he was ordered to pay $50,700 in restitution; Lawal was sentenced to 30 months imprisonment, 2 years of supervised release, 300 hours of community service, and he was ordered to pay $25,000 in restitution. These sentences included a two-level increase for obstruction of justice for Akindele under U.S.S.G. § 3C1.1 and an upward departure of two-levels for both defendants under U.S.S.G. § 5K2.0. No sentencing credit was granted to either defendant for acceptance of responsibility under U.S.S.G. § 3E1.1. These appeals followed.

## II. DISCUSSION

Akindele and Lawal raise a host of challenges to their sentences. We need only address the most meritorious of these arguments here.

### A. *Upward Departures*

Akindele and Lawal first challenge the district court's decision to upwardly depart from their base offense levels pursuant to U.S.S.G. § 5K2.0. Section 5K2.0 states, in pertinent part:

> [T]he sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

(quoting 18 U.S.C. § 3553(b)). Acting under this authority, the district court increased each defendant's offense level by two levels. The district court reasoned that the nature and degree of harm suffered by the individual victims of Akindele and Lawal's scheme had not been adequately considered by the Commission.

---

2. Akindele later stated that he had found the social security card of Crum in an apartment building which he was renovating. The record indicates that the real Crum was serving a jail term during the relevant time period.

■ We employ a three-step approach in our review of a district court's departure from the applicable guideline range:

> (1) we review *de novo* whether a district court's stated grounds for departure may be relied upon to justify the departure; (2) we review for clear error whether the facts that support the grounds for departure actually exist in the case; and (3) we review deferentially whether the degree of departure is appropriate.

*United States v. Seacott,* 15 F.3d 1380, 1386 (7th Cir.1994) (citations omitted).

First, we must determine whether the Commission adequately considered the aggravating factor behind the departure.[3] If the Commission has considered the factor, a departure is not justified. Akindele and Lawal primarily challenge the departure on the BS round that it was based upon an improper analogy to the vulnerable victim classification of U.S.S.G. § 3A1.1.[4] It is our conclusion that the sentencing court got this issue right—we agree that the Commission did not adequately consider the sort of harm suffered by the individual victims here.

■ We should initially note, however, that we do concur with the appellants insofar as we feel that a direct analogy to the vulnerable victim classification here would be improper. We readily acknowledge that the completion of a mortgage application places one in a vulnerable position-there on the page, most of that personal information which our modern society views as essential lies exposed. Moreover, these victims were targeted *because* they were susceptible. After all, Akindele and Lawal could have cold-called random individuals and tried to wheedle pertinent credit information out of them, but this would have meant more work for less gain. A departure on this ground would be improper because vulnerability of this sort has already been adequately considered by the Commission, as evidenced by the existence of § 3A1.1.

■ The district court, however, was expressly swayed by the nature and degree of harm suffered by the appellants' victims—not by their exceptional vulnerability.[5] As the record indicates, the victims were caused a great deal of worry and inconvenience, their credit histories were tarnished, and criminal records were erroneously created in their names.[6] The record reveals that the district court turned to § 3A1.1 only *after* it had decided that a departure was warranted; the court's purpose at that time was limited to the determination of how large a departure to craft. This limited analogizing was not erroneous, in fact it was required under the Guidelines: "In departing the judge should compare the seriousness of the aggravating factors at hand with those the Commission considered." *United States v. Ferra,* 900 F.2d 1057, 1062 (7th Cir.1990).

■ Thus, we may now reach the gist of the first step of our review—whether the type and degree of harm suffered by these victims is adequately considered in the Guidelines. The pertinent Guideline section for offenses involving fraud or deceit is § 2F1.1. A review of this section indicates that the Commission was most concerned with the amount of loss, the degree of pre-

---

3. "In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b).

4. Section 3A1.1 states: "If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels."

5. As the court noted in response to an objection raised on this point by Akindele's attorney:

> It's a broader, more generic use that he is giving to [the vulnerable victim analogy] rather than a particular supportable argument. And

you're correct, it isn't the same kind of vulnerable victim that the Guidelines discuss, but that is not what Mr. Mitchell says he intended to suggest. . . .
> . . . .
> . . . [H]e is trying to find values here that he suggests I might use as a benchmark or a touchstone or a comparative value to vulnerable victim. He didn't say that I should enhance because they're vulnerable victims.

Sentencing Transcript, at 275–76.

6. As the district court noted: One's reputation is "the most easily lost and the hardest regained." Sentencing Transcript, at 276.

meditation, and the number of victims. The Background to § 2F1.1 confirms this limited focus:

Empirical analyses of pre-guidelines practice showed that the most important factors that determined sentence length were the amount of loss and whether the offense was an isolated crime of opportunity or was sophisticated or repeated. Accordingly, although they are imperfect, these are the primary factors upon which the guideline has been based.

▉ Section 2F1.1 does expressly authorize a harm-based increase, but it is confined to victimized financial institutions. *See* § 2F1.1(b)(6)(A).[7] The facts of this case demonstrate, however, that individual victims of fraud may also be harmed in a fashion which transcends the mere amount of loss. As the Application Notes state, a departure is appropriate in such a situation: "In cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted." U.S.S.G. § 2F1.1, App. Note 10.[8] Accordingly, we conclude that the district court did not err when it determined that a departure was justified under these facts.

▉ This brings us to the second step of our review—whether the record adequately supports the conclusion that the individual victims of Akindele and Lawal's fraud were harmed in a manner more serious than the loss or intended loss to these victims would otherwise indicate. At the sentencing hearing, testimony was given by two of the approximately fifteen victims of the appellants' scheme. Donald Nowak, who drove several hundred miles to attend the sentencing hearing, testified that he is unable to open a checking account and that the trouble he experienced in obtaining loans forced him to accept a loan with unfavorable terms. Sentencing Transcript, at 89–90. Peter Kennedy testified that the credit-related problems he

encountered were aggravating, extremely time consuming, and necessitated the hiring of an attorney: "[W]e go for sixteen years working on a perfect [credit rating] and then someone comes along in a year and screws it up on you." Sentencing Transcript, at 97. This testimony, and the other evidence of record, led the district court to conclude:

[I]t is an enduring victimization in that the persons subjected to it may never totally recover, because it is true that once your name is sullied, it's very difficult to get everyone in the world to believe [the truth] ... and you are then subject continually all your life to the possibility of being blindsided, although now you might know where it originated, you don't know how it has proliferated.... If you will, it's like having adult chicken pox and always wondering whether you're going to get shingles.

Sentencing Transcript, at 290. The appellants do not seriously challenge the district court's findings regarding the hardships suffered by their victims. Accordingly, we find that the record adequately supports the district court's factual findings on this subject.

▉ Last, we ask whether the district court abused its discretion when it determined that a two-level departure was called for under these circumstances. As we have previously stated, a decision to depart must be linked to the rationale and methodology of the Guidelines. *See, e.g., United States v. Thomas,* 930 F.2d 526, 530–31 (7th Cir.) (citations omitted), *cert. denied,* 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991), *overruled on other grounds, United States v. Canoy,* 38 F.3d 893, 906 (7th Cir.1994). "The sentencing judge is thus required to articulate the specific factors justifying the extent of his departure and to adjust the defendant's sentence by utilizing an incremental process that quantifies the impact of the factors consid-

---

7. Section 2F1.1(b)(6)(A) states: "If the offense— (A) substantially jeopardized the safety and soundness of a financial institution ... increase by 4 levels."

8. One of the examples, provided in Application Note 10, of an instance where a departure may

be warranted encompasses at least a portion of the harm at issue here: "Examples may include the following: ... (c) the offense caused reasonably foreseeable, physical or psychological harm or severe emotional trauma...." U.S.S.G. § 2F1.1, App. Note 10(c).

ered by the court on the defendant's sentence." *Id.* at 531.

We conclude that the district court correctly linked its departures here to the structure of the Guidelines. The court specifically explained its reason for departing—the unusual nature and degree of harm suffered by the individual victims of the fraud—and it then properly quantified the impact of this factor by comparing it to other aggravating factors which the Commission has considered. As discussed above, this comparison was the primary purpose behind the district court's analogy to the vulnerable victim classification of § 3A1.1. Contrary to the appellants' assertions, the court only turned to this classification in an effort to determine how large a departure was warranted, not to determine whether a departure was called for in the first place.

 Thus, we conclude that the departures were consistent with the dictates of the Guidelines. Before moving on to the next issue, however, we must address the appellants' final departure-related argument. Akindele and Lawal claim that they were not provided with sufficient notice that the district court was contemplating a departure from their respective Guideline ranges. It is well established that some prior notice of intent to depart is required. *See, e.g., Burns v. United States,* 501 U.S. 129, 135, 111 S.Ct. 2182, 2185–86, 115 L.Ed.2d 123 (1991).

Our review of the record reveals that Akindele and Lawal were provided with notice that a departure might be considered. The government expressly mentioned § 5K2.0 in its response to Akindele and Lawal's objections to their PSIs. The government stated that it:

> intend[ed] to make a motion for an upward departure pursuant to § 5K2.0, in that financial loss calculations do not adequately reflect the seriousness of harm caused to the individual victims ... whose credit history and good names have been immeasur-

abl[y] damaged. Further, some of the victims suffered embarrassment, frustration, and other inconveniences, as well as, incurred legal debts in an effort to defend themselves from collection agencies and department stores as a result of defendants['] fraud schemes.

Such a prehearing submission by the government is sufficient to put a defendant on notice. *Burns,* 501 U.S. at 138, 111 S.Ct. at 2187.

The government did, however, quite specifically condition its intention to seek a departure. The government initially averred that it would only request such a departure if the district court arrived at a lower loss calculation than the government believed was appropriate. Although the government was able to secure base offense levels for each defendant consistent with its wishes, it nevertheless decided to pursue departures.[9]

We conclude that the appellants were not prejudiced by the government's "broken promise." After all, Akindele and Lawal did not learn that the district court would accept the government's loss calculations until during the sentencing hearing. Faced with that uncertainty, the departure issue could and should have been thoroughly researched beforehand. The (albeit conditional) notice provided by the government contained all the information necessary for Akindele and Lawal to prepare and respond effectively. *See Burns,* 501 U.S. at 138–39, 111 S.Ct. at 2187 (holding that the requisite "notice must specifically identify the ground on which the district court is contemplating an upward departure") (footnote omitted).

 The appellants correctly note that no mention was made before the sentencing hearing that the district court might look to the vulnerable victim classification of § 3A1.1. As discussed above, however, the district court analogized the situation before it to the vulnerable victim classification only after it had decided that a departure was

---

9. Gregory Mitchell, for the government, explained his actions on this subject as follows:

> I concur that I did not tell them affirmatively that I would be requesting an upward departure of two points or any points based on the evidence, and I can only state for the record

that I could not make that motion or did not decide to make that motion until I had an opportunity to talk to the victims and that was not until the day before the sentencing ... first began.

Sentencing Transcript, at 270.

warranted. The analogy was employed for the limited purpose of determining the appropriate degree of departure.

Moreover, after the vulnerable victim analogy was raised, counsel for the appellants were able to research this issue during a lunch break. After the break, the court asked whether they required additional time: "Do you feel that you need more time or that you have been unfairly treated by this subject being raised in the fashion it has in the last couple of days, because I'll give you more time if need it." Sentencing Transcript, at 286. Gerald Collins, counsel to Lawal and the defense attorney delegated to address the departure issue, replied: "I don't feel I need more time.... [W]hy do I need more time to answer when [the government] doesn't have a ground?" *Id.* at 286–87. Therefore, we conclude that the appellants were provided with sufficient notice of the contemplated departures.

### B. *The Denial of Reductions for Acceptance of Responsibility*

 Akindele and Lawal next argue that the district court improperly refused to grant them each a two-level decrease of their base offense levels for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The district court's acceptance of responsibility determination is a factual decision which we subject to clear error analysis. *United States v. Townsend,* 73 F.3d 747, 754 (7th Cir.1996) (citations omitted). *See also* U.S.S.G. § 3E1.1, App. Note 5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review."). Reviewing the record under this deferential standard, we cannot conclude that the district court has committed clear error here.

Under § 3E1.1(a), a decrease may only be granted "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." The Application Notes to § 3E1.1 list the following non-exclusive list of appropriate considerations for use in this regard:

(a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)....;

(b) voluntary termination or withdrawal from criminal conduct or associations;

(c) voluntary payment of restitution prior to adjudication of guilt;

(d) voluntary surrender to authorities promptly after commission of the offense;

(e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(f) voluntary resignation from the office or position held during the commission of the offense;

(g) post-offense rehabilitative efforts (*e.g.,* counseling or drug treatment); and

(h) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

U.S.S.G. § 3E1.1, App. Note 1.

 The burden rests upon the defendant to "clearly demonstrate" his entitlement to a reduction under § 3E1.1 and this showing must be made by a preponderance of the evidence. *United States v. Morris,* 76 F.3d 171, 175–76 (7th Cir.1996) (citations omitted). Akindele and Lawal claim that they clearly demonstrated their acceptance of responsibility by cooperating with the government,[10] admitting their roles in the fraudulent scheme, and by pleading guilty. As the Application Notes expressly state, however, "[a]

---

**10.** Akindele, for example, asserts that he assisted the government by consenting to a search of a storage locker he had rented in the name of Garland Crum and by disclosing the location of two automobiles that he had purchased through his fraudulent scheme. The government, however, paints a less remorseful portrait of Akindele's conduct:

> [O]nly after Akindele was advised by the government that investigators had located a Public

Storage locker in the name of Garland Crum ... and further advised that a search warrant would be obtained for the locker, did defendant admit that he had personal belongings stored in this locker and that some of the items stored in this locker belonged to Lawal.

Government's Response to Akindele's Objections to the PSI, at 3.

defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." U.S.S.G. § 3E1.1, App. Note 3. That evidence of contrition which is established by a guilty plea [11] "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id.*

The record reveals several actions by Akindele and Lawal which may be viewed as inconsistent with an affirmative acceptance of responsibility. We need only discuss two illustrative examples here. First, it is probative of appellants' penitence that they did not enter their guilty pleas until after two days of jury selection.[12] By this time, more than a year had passed since the grand jury returned its second superseding indictment. The Application Notes expressly mention "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility" as one factor to consider in the § 3E1.1(a) determination. U.S.S.G. § 3E1.1, App. Note 1(h).

 Practical concerns and common sense also dictate that defendants manifest their acceptance of responsibility in a timely fashion.... Last minute pleas contribute to the delays and backlog that plague federal and state court dockets. Not only are jurors and witnesses inconvenienced because they have been summoned at great expense to the public but also the trial court has allocated trial time that cannot be immediately filled by another case because witnesses and counsel are not immediately available and cannot lay aside their other daily responsibilities and endeavors at the drop of a hat.

*United States v. Tolson,* 988 F.2d 1494, 1499 (7th Cir.1993). It is not clear error to view such a last minute plea as more indicative of a defendant's wish to escape greater punishment than as a genuine expression of contrition.

Second, Akindele and Lawal both objected to the characterization of their activities as a conspiracy, going so far as to argue that they had actually acted "in spite of" one another. The record, however, is replete with evidence indicating that a confederacy for the purpose of furthering the fraudulent scheme at issue did indeed exist between Akindele and Lawal. Among other examples of their joint efforts, Akindele shared the credit information that he obtained through the operation of his sham business, Akindele used Lawal's sham business as a reference to obtain an apartment under a false name, and Akindele returned items purchased by Lawal with fraudulently obtained credit cards for cash or store credit.

 We have previously observed that "[c]ontesting the veracity of the alleged relevant conduct is no doubt permissible and often perfectly appropriate. However, if a defendant denies the conduct and the court determines it to be true, the defendant cannot then claim that he has accepted responsibility for his actions." *United States v. Cedano–Rojas,* 999 F.2d 1175, 1182 (7th Cir. 1993). Whether the appellants' denials of the existence of a conspiracy were fueled by their desire to secure a lesser sentence, or whether their denials primarily sprang from personal animosity between the two is of no account.

In the final analysis, "an appellate court is ill-equipped to assess whether a particular defendant is motivated by genuine acceptance of responsibility or by a self-serving desire to minimize his own punishment. Unlike the district court judge, we do not enjoy a 'front row seat' from which to assess [the defendant's] statements and demeanor." *United States v. Taylor,* 72 F.3d 533, 551–52 (7th Cir.1995) (quoting *United States v. White,* 993 F.2d 147, 151 (7th Cir.1993) (citation omitted)). From its superior vantage point, the district court concluded that Akin-

11. Application Note 3 states:

Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3

(Relevant Conduct) (*see* Application Note 1(a)), will constitute significant evidence of acceptance of responsibility....

12. It is true that Akindele did seek to plead guilty beforehand, but his offers were rejected on the ground that they did not encompass the entire indictment.

dele and Lawal had not genuinely accepted responsibility for their actions. As the court stated at sentencing:

> They have fought as hard as they could to avoid responsibility for their actions in the opinion of the Court. Now they finally realize, to some extent with the advice, good advice of counsel, I suspect, they finally realize the smart thing for them to do is to plead, and they did, and since then they have had all sorts of remorse.... Lots of people get sorry when they're facing the penalty. It's human nature. I don't accept it.

Sentencing Transcript, at 242. We conclude that this determination was not clearly erroneous.

### C. *The Increase of Akindele's Offense Level for Obstruction of Justice*

 Akindele further argues that the district court erred when it increased his base offense level by two levels for obstruction of justice under U.S.S.G. § 3C1.1. Section 3C1.1 provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." The sentencing court's determination that a defendant has obstructed justice is a finding of fact which we review under the clearly erroneous standard. *United States v. Casanova*, 970 F.2d 371, 377 (7th Cir.1992) (citations omitted).

The record reveals that Akindele did attempt to conceal his identity when he was first arrested for a traffic offense in October 1993 by asserting that his name was Garland Crum. If this action constituted the entire extent of Akindele's obstructive activities, he would likely prevail on this issue. Among the examples provided in the Application Notes of conduct which does not warrant the application of the § 3C1.1 enhancement is "providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hinderance to the investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1, App. Note 4(a).

Akindele's obstructive conduct was not limited to this single instance, however. Sometime after the October 1993 traffic arrest, Akindele incorporated the name Garland Crum. Akindele's apparent motivation for this incorporation was revealed upon his arrest in November 1993, as he attempted to withdraw funds from an account opened under the Crum name. When questioned by a federal law enforcement official, Akindele again claimed that his name was Garland Crum. Akindele then quickly modified his story and maintained that he was, at least, entitled to use the Crum name in light of his recent act of incorporation. At the sentencing hearing, the court agreed with the government's contention that Akindele incorporated the name Garland Crum in an effort to "legalize" it—and thereby keep his fraudulent scheme afloat—and to develop a defense in the event that he was apprehended.[13]

The record also shows that, following his November 1993 arrest, Akindele instructed an acquaintance, Tonya Robinson, to complete a change of address form on Akindele's behalf in order to redirect mail delivered to his residence to a post office box. The government charged that these actions were designed to prevent investigators from obtain-

---

**13.** In his brief before this court, Akindele argues this point by glossing over certain facts of record:

> The Government asserted that when the scheme was first uncovered, Akindele was arrested under the name of Garland Crum rather than his actual name. The Government contended that the use of the name "Garland Crum" upon arrest was evidence of Akindele's effort to continue his scheme. *It was not until after his arrest on the traffic stop, that the Government first started to investigate his use of the identity of Garland Crum, his own several identities and social security numbers, and credit and loans he obtained through such use. He remained in custody throughout the pendency of the indictment in this cause....*
> *Obviously, while Akindele sat in custody no further action could be or was taken by him....*

Appellant Akindele's Brief, at 24 (emphasis added). What Akindele omits to mention is the fact that more than a month passed between the time of "his arrest on the traffic stop" and the commencement of his period of "custody." It was during this period that Akindele incorporated the Crum name and it was at the tail end of this time frame—upon his November 25, 1993 arrest—that Akindele again claimed falsely that his name was Garland Crum.

ing further information regarding Akindele's activities.[14] The Application Notes list, as illustrative of the type of conduct which the obstruction enhancement is designed to address, "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." U.S.S.G. § 3C1.1, App. Note 3(d).

We therefore conclude that the district court did not clearly err when it found that Akindele had obstructed, or attempted to obstruct, justice.

### D. The Determination that Lawal was Accountable for Over $200,000 of Loss

■ Lawal also contests the district court's finding that he is accountable for over $200,000 of loss.[15] The district court reached this figure after it concluded that Akindele's fraudulent procurement of certain bank loans constituted "relevant conduct" for purposes of determining Lawal's base offense level. U.S.S.G. § 1B1.3. Where there is a "jointly undertaken criminal activity," § 1B1.3(a)(1)(B) directs the sentencing court to consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" when determining a defendant's base offense level. The conclusion that conduct is "relevant" under § 1B1.3 is a factual finding which we review for clear error. *United States v. Nunez*, 958 F.2d 196, 198 (7th Cir.) (citation omitted), *cert. denied*, 506 U.S. 857, 113 S.Ct. 168, 121 L.Ed.2d 115 (1992).

No one disputes that Akindele committed the lion's share of the fraudulent activities here in question. Moreover, it may well be true that Akindele concealed certain large bank loans from Lawal. It is also a fact, however, that Lawal pleaded guilty to all of the counts brought against him, including the bank fraud charges.

We conclude that the district court did not clearly err when it found that Akindele's fraudulent bank loans were reasonably foreseeable acts performed in furtherance of Akindele and Lawal's jointly undertaken criminal activity. *See* U.S.S.G. § 1B1.3, Illus. (c)(2).[16] The Guidelines do not require that Lawal have been aware of the particulars of each and every action committed by Akindele. So long as Akindele's actions were reasonably foreseeable and in furtherance of the jointly undertaken criminal activity, Lawal is as accountable as Akindele himself. The record indicates that Lawal knew that Akindele was purchasing properties; Lawal further knew that his activities would help Akindele accomplish this objective. In addition, Lawal's arguments on this point largely contravene his voluntary and knowing guilty plea and the district court correctly rejected Lawal's efforts to re-litigate this issue.

We have also considered and rejected the other arguments raised by the appellants.

### III. CONCLUSION

For the reasons provided above, we affirm the sentences imposed by the district court.

AFFIRMED.

---

14. Akindele claims that his instructions to Robinson "were done not to obstruct justice but to protect the equity positions that had been established in the property." Appellant Akindele's Brief, at 25.

15. Pursuant to U.S.S.G. § 2F1.1(b)(1)(I), the finding that Lawal's offense involved a loss exceeding $200,000 added 8 levels to his base offense level of 6.

16. Illustration (c)(2) closely parallels the circumstances of this case:

Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud. Defendants F and G each are accountable for the entire amount ($55,000). Each defendant is accountable for the amount he personally obtained under subsection (a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable in connection with that criminal activity.