**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard BAILEY, Defendant–Appellant.**

No. 95–2504.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 3, 1996.

Decided Oct. 9, 1996.

pattern of racketeering schemes, using Chicago-area stables to defraud wealthy customers with little knowledge of the horse business. Advertisements lured potential customers to the stables; once there, the conspirators evaluated which prospects were most likely to be wealthy, going so far as to obtain confidential credit and financial information. These persons were then persuaded to invest large sums in relatively worthless, or at least significantly overvalued, horses.

Bailey, the owner of Bailey Stables and Country Club Stables, specialized in defrauding middle-aged or older women who had recently been widowed or divorced. After meeting them at the stables or through personal advertisements, he began to romance them, escorting them to expensive Chicago restaurants and sending them flowers and gifts. If he discovered the woman was not wealthy, he declined to see her again. If she was wealthy, he proceeded to secure her affection, engaging in sexual relations and in some cases proposing marriage, despite the fact that he was already married.

Bailey then implemented one or more of several fraud schemes. In one, he claimed that his money was temporarily tied up, but that he had found a horse that was a wonderful investment opportunity. Using the horse as collateral, in order to make the purchase he secured a temporary loan from the victim, which he never repaid. Once he defaulted on the loan, the victim became responsible for the horse's boarding bills (allowing the co-conspirators additional income as well as the opportunity to take the horse back in satisfaction of unpaid bills). A second scenario saw Bailey persuading the victim to enter into an investment partnership. Bailey and his co-conspirator (who posed as the seller) agreed beforehand on a price for an overvalued horse. Bailey then bargained with the seller in the presence of the victim. He and the victim each wrote a check for one-half the selling price, but after the victim left he and the seller tore up his check and split the proceeds from the victim's check. A third scheme involved selling a client an overvalued horse which did not suit her needs, then persuading her to trade the

Barry Rand Elden, Chief of Appeals and Ronald Safer (argued), Chicago, IL, for Plaintiff–Appellee.

Allan A. Ackerman (argued), Chicago, IL, Thomas A. Durkin, Michigan City, IN, and Jo–Anne Wolfson, Tampa, FL, for Defendant–Appellant.

Before POSNER, Chief Judge, and FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Richard Bailey appeals the mandatory sentence of life imprisonment he received after the district court determined that, as part of his racketeering activities, Bailey conspired to murder and solicited the murder of candy empire heiress Helen Vorhees Brach. We affirm.

I.

For approximately two decades, Richard Bailey and his confederates engaged in a

horse and additional monies for more expensive horses. While executing his schemes, Bailey was not averse to taking advantage of his victims' weaknesses: he plied an alcoholic with champagne and cocktails while she and her daughter visited the stables, and he schemed to defraud gravely ill women by obtaining their powers of attorney when he visited them in the hospital. When Bailey had gained as much money as he could from the woman, he ended the relationship, though occasionally he passed the woman on for his co-conspirators to further defraud. His victims were often left broken-hearted and destitute.

Helen Vorhees Brach, millionaire heiress to the Brach candy fortune, was one of Bailey's victims. She met Bailey in 1973 and they entered into a relationship. In 1975, Bailey's brother, Paul, sold her three horses for $98,000; unknown to Brach, Bailey also participated in the sale, and the horses were worth less than $20,000. Additionally, Brach bought a group of expensive brood mares.

On New Year's Eve 1977, Brach and Bailey "danced the night away" at New York's Waldorf–Astoria, but their relationship soon began to deteriorate. Early in 1977, Bailey and a co-conspirator arranged an extensive showing for Brach, hoping to persuade her to invest $150,000 in more horses. Brach left in less than an hour. Further, an appraiser Brach hired recommended she invest nothing in training one of her original three purchases, contrary to the $50,000 estimate of the trainer recommended by Bailey. Around this time Brach also visited her breeding stock. After viewing the mares, she openly displayed rage at the stables, screaming about being cheated and informing anyone within earshot that she was going to the district attorney's office. Subsequently, she told a close friend that she was disturbed about her purchase of horses from a younger man whom she had been seeing (Bailey), and after hearing that her friend knew state prosecutors, she agreed to visit the State's Attorney's office after she returned from her upcoming visit to the Mayo Clinic. Brach departed from the Mayo Clinic on February 17, 1977. She was never seen again, and her body has never been found. Bailey was interviewed in connection with her disappearance but no charges were filed at the time.

In a highly publicized 1994 case, Bailey was named in a multi-count indictment alleging racketeering and fraud activities, and in 1995 he pleaded guilty to charges of conspiracy to conduct racketeering, 18 U.S.C. § 1962(d); racketeering, 18 U.S.C. § 1962(c); mail fraud, 18 U.S.C. § 1341; wire fraud, 18 U.S.C. § 1343; money laundering, 18 U.S.C. § 1956(a)(1)(B)(i); and unlawful monetary transactions, 18 U.S.C. § 1957(a). The district court conducted a two-week sentencing hearing, at which the parties called numerous witnesses and Bailey testified on his own behalf. After the hearing, the district court determined that, disregarding the allegations related to Brach's disappearance, Bailey's offense level would be set at 30,[1] and that it would have imposed a sentence of 135 months.[2] Because it further found by a preponderance of the evidence that as part of his racketeering conduct Bailey had conspired to murder and had solicited the murder of Helen Brach, however, the district court, pursuant to Guideline sections 2X1.1 and 2A1.1,[3] determined that Bailey's offense level was 43 and sentenced him to the mandatory term of life imprisonment. The court also declined to grant Bailey a reduction for acceptance of responsibility.

1. This offense level was calculated using a base offense level of 19, U.S.S.G. § 2E1.1, adding two levels for vulnerable victims, § 3A1.1, two levels for abuse of private trust, § 3B1.3, four levels for being a leader or organizer, § 3B1.1, and three levels for a combination of extreme psychological injury, §§ 2F1.1 and 5K2.3, unusually degrading conduct, § 5K2.8, and knowing endangerment of solvency, § 2F1.1, for a total of 30.

2. The district court found that Criminal History Category I significantly underrepresented the seriousness of Bailey's criminal history and that his criminal history was significantly more serious than that of most defendants in Category I; consequently, it made an upward departure and placed Bailey in Criminal History Category II, establishing a sentencing range between 108 and 135 months. This determination is not challenged on appeal.

3. Guideline section 2X1.1 sets the base offense level for conspiracy and solicitation at the level of the substantive offense; Guideline section 2A1.1 sets the offense level for homicide at 43.

## II.

On appeal, Bailey challenges his sentence, contending that the district court erred in concluding 1) that he solicited the murder of and conspired to murder Helen Brach; 2) that he did not deserve a reduction for acceptance of responsibility; and 3) that his conduct merited enhancement for vulnerable victims and abuse of private trust. He also attacks the imposition of a Guidelines sentence upon him as a violation of the *Ex Post Facto* Clause.

## A.

■ Bailey first attacks the district court's determination that he solicited the murder of and conspired to murder Helen Brach. Although it is well-settled that only a preponderance of the evidence is required to establish factual findings under the Sentencing Guidelines, *United States v. Porter*, 23 F.3d 1274, 1277 (7th Cir.1994); *United States v. Masters*, 978 F.2d 281, 286 (7th Cir.1992), *cert. denied*, 508 U.S. 906, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993), he contends that in the unique circumstances of this case, it was inappropriate for the district court to use the preponderance standard to make its findings. Rather, he concludes, that for such a dramatic increase in sentencing range, the proper standard for evaluating evidence at sentencing should be the clear and convincing evidence standard.

A majority of the full court recently declined to examine this very question, see *United States v. Rodriguez*, 73 F.3d 161, 162 (7th Cir.1996), and as in *United States v. Evans*, 92 F.3d 540, 545 (7th Cir.1996), it would be inappropriate for this panel to attempt to reopen the issue. And, although Bailey seeks to take advantage of our previous recognition that "[a] higher standard might be called for [ ] in the rare instance where a factual finding will result in a sentencing increase so great 'that the sentencing hearing can fairly be characterized as a "tail which wags the dog of the substantive offense," ' " *United States v. Corbin*, 998 F.2d 1377, 1387 (7th Cir.1993) (quoting *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir.1991)), *cert. denied*, 510 U.S. 1139, 114 S.Ct. 1124, 127 L.Ed.2d 432 (1994); see also *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 91, 106 S.Ct. 2411, 2417, 2418–19, 91 L.Ed.2d 67 (1986), this case, despite its uniqueness, is not that rare instance.

■ First, Bailey neglected to make his arguments to the district court and thus he has waived the contention. *United States v. Gonzalez*, 933 F.2d 417, 448 (7th Cir.1991). We believe it fair to apply this often-reiterated rule here because, although Bailey could not be expected to request the district court to change circuit precedent by adopting the clear and convincing standard, he also relies upon existing law (in the form of the exception for greatly disproportionate sentencing increases), which the district court was well able to consider applying if given the opportunity.

■ Even were we to reach the merits of Bailey's argument, however, we would affirm the use of the preponderance standard here. Practically speaking, because of Bailey's age at sentencing (sixty-six) the sentence differences in this case do not distinguish it from several cases this court has affirmed previously. We take judicial notice that on the average, a sixty-five-year-old white male United States citizen in 1992 could expect to live 15.4 more years. BUREAU OF THE CENSUS, UNITED STATES DEPARTMENT OF COMMERCE, *Statistical Abstract of the United States:* 1995 86 (115th ed.1995). The district court clearly stated that it would impose a 135–month sentence, approximately eleven years, in the absence of the Brach evidence. The difference between eleven years and 15.4 years does not approach the level of other sentencing increases in which this court has approved the use of the preponderance standard (including cases in which a life sentence was imposed). See, *e.g.*, *United States v. Rodriguez*, 67 F.3d 1312, 1323 (7th Cir.1995) (life imprisonment), *cert. denied*, —— U.S. ——, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996); *Porter*, 23 F.3d at 1277 (increase from 33–41 months to 110–137 months); *Masters*, 978 F.2d at 286 (from 33–41 months to two consecutive twenty-year terms); *United States v. Trujillo*, 959 F.2d 1377, 1382 (7th Cir.) (from 115 months to 168 months), *cert. denied*, 506 U.S. 897, 113 S.Ct. 277, 121

L.Ed.2d 204 (1992); *United States v. Ebbole,* 917 F.2d 1495, 1496 (7th Cir.1990) (more than three-fold increase).

## B.

■ Bailey contends that the district court erred in denying him a three-level reduction for acceptance of responsibility under Guideline section 3E1.1, because he saved the government the expense of a trial estimated to last ten to twelve weeks by extensively acknowledging his fraudulent dealings with multiple victims. Although, again practically speaking, the difference between level 40 (324–405 months imprisonment) and level 43 means little to Bailey, we will address this contention, reviewing the district court's decision for clear error. *United States v. Akindele,* 84 F.3d 948, 956 (7th Cir.1996); *see also Koon v. United States,* — U.S. —, —, 116 S.Ct. 2035, 2039, 135 L.Ed.2d 392 (1996).

■ It is Bailey's burden to "clearly demonstrate" his entitlement to the reduction, *United States v. Wetwattana,* 94 F.3d 280, 285 (7th Cir.1996); *Akindele,* 84 F.3d at 956, and he is not entitled to the reduction simply because he timely entered a guilty plea, *Wetwattana,* 94 F.3d at 285–86; *Akindele,* 84 F.3d at 957. Moreover, " 'if a defendant denies the [relevant] conduct and the court determines it to be true, the defendant cannot then claim that he has accepted responsibility for his actions.' " *Id.* (quoting *United States v. Cedano–Rojas,* 999 F.2d 1175, 1182 (7th Cir.1993)).

Here, the district court determined that during his testimony Bailey lied about the extent of his fraudulent activities, minimized his conduct, and attempted to characterize his relationship with his victims as conduct similar to that engaged in by regular businesspeople. Many of Bailey's assertions were contradicted by witnesses the district court found more credible. Although Bailey claims to have confessed to almost everything, the district court's determination about the veracity of his admissions cannot be considered clearly erroneous. Moreover, Bailey denied everything relating to the Brach affair, which representations the court determined were untrue.

■ Further, Bailey seems to argue that acceptance of responsibility is distinct from the concept of remorse. This court has stated, however, that "[w]hat the sentencing judge is to look for is a defendant's demonstration of 'genuine remorse,' or 'conscience.' " *United States v. Dvorak,* 41 F.3d 1215, 1217 (7th Cir.1994). The trial court must "look beyond formalistic expressions of culpability and [ ] determine whether the defendant has manifested an acceptance of personal responsibility for his offense in a moral sense." *United States v. Hammick,* 36 F.3d 594, 600 (7th Cir.1994). The district court indicated that it found no such contrition on Bailey's part, rather just the opposite. We find no clear error in the district court's denial of the reduction.

## C.

Bailey additionally challenges, as a violation of the *Ex Post Facto* Clause, the use of the Sentencing Guidelines to punish actions that occurred long before the Guidelines went into effect November 1, 1987. Because he correctly concedes that circuit precedent is adverse to his position, see *United States v. Masters,* 924 F.2d 1362, 1369 (7th Cir.), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991); *United States v. Fazio,* 914 F.2d 950, 958–59 (7th Cir.1990), and fails to give us any reason to alter that precedent, we decline to revisit the issue. Finally, in light of our decision affirming the use of offense level 43, we need not reach his claims that the district court improperly increased his offense level to 30 by finding that he targeted vulnerable victims, U.S.S.G. § 3A1.1, and abused a private trust, U.S.S.G. § 3B1.3.

AFFIRMED.