**Ross HUGI, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

No. 98–2605.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1998.

Decided Jan. 7, 1999.

Steven L. Popuch (argued), Popuch & Associates, Chicago, IL, for Petitioner–Appellant.

Ted Chung (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Respondent–Appellee.

Before FLAUM, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Richard Bailey and his henchmen operated a decades-long scam in which they fleeced wealthy (but lonely) women. Helen Vorhees Brach, one of the victims, was murdered to prevent her from alerting prosecutors, and for this Bailey is serving life in prison. *United States v. Bailey*, 97 F.3d 982 (7th Cir. 1996). Other "victims were often left broken-hearted and destitute." *Id.* at 984. Ross Hugi, one of Bailey's henchmen, was a veterinarian associated with the stables that served as the scheme's focal point. Hugi cooperated with prosecutors between 1990 and 1994, helping them build a case against Bailey. As a reward for this assistance, Hugi was allowed to plead guilty to a one-count information charging him with wire fraud, in violation of 18 U.S.C. § 1343. His sentence was a modest six months' imprisonment, plus three years' supervised release, a $22,000 fine, and restitution. Having served the imprisonment—and confident that the statute of limitations has run on any other crimes he may have committed—Hugi now contends that he should not have been convicted in the first place.

The information alleged that Hugi and Bailey cooperated to defraud "Victim J" of $50,000. Bailey told Hugi to prepare a document that purported to obligate Bailey to buy four horses from Hugi for $60,000. According to this document, Bailey had made a $10,000 downpayment, which he would forfeit if he

did not produce the remaining $50,000. This deceit persuaded Victim J to lend $50,000 to Bailey, who gave $20,000 of this to Hugi for his role in the deceit. Bailey never repaid the "loan" but defaulted and left Victim J with a security interest in four mares that were not worth close to $50,000. Bailey and confederates then induced Victim J to pay inflated boarding expenses for her "collateral." So much for the fraud; as for the wire element, according to the information Victim J came to Bailey's attention when she responded to a lonely-hearts ad Bailey had placed with the Pioneer Press. Bailey paid for the advertisement by credit card, and Pioneer Press verified the charge by interstate wire communication. Hugi was allegedly accountable for the entire scheme, including the wire component.

Hugi pleaded guilty and filed with the court a written plea agreement that conceded every allegation of the information and then some. Hugi agreed that he knew Bailey to be a con man, helped him gull Victim J, and kept $20,000 of the pelf. Hugi agreed that an interstate wire communication occurred on July 27, 1989, when Pioneer Press verified the charge. Hugi also acknowledged "that it was foreseeable to him that interstate wire communication facilities would be used by Richard Bailey in furtherance of the scheme to defraud."

Thomas Foran, who represented Hugi between 1990 and the guilty plea, withdrew in January 1995 and was replaced by Stephen Popuch. Sentencing did not occur until October 3, 1995, more than 13 months after the guilty plea and approximately 8½ months after Popuch appeared. Popuch remains Hugi's counsel in this petition for relief under 28 U.S.C. § 2255. Asserting that Pioneer Press had not used interstate communications to verify the charge, Hugi contended that the district court therefore lacked "jurisdiction" and that Foran's failure to discover this shortcoming amounted to ineffective assistance of counsel. Moreover, Hugi insisted, any verification of the charge must have occurred before July 27, 1989, so the five-year statute of limitations barred the prosecution (which began on July 27, 1994), and again Hugi blamed Foran for his failure to raise

this affirmative defense. But the district judge held these contentions forfeited, because Hugi failed to present them during the 8½ months between Foran's replacement and sentencing. 1998 U.S. Dist. Lexis 2731 (N.D.Ill.1998). The judge remarked: "There is no contention that new counsel provided ineffective assistance to Hugi or that new counsel could not discover the presently claimed weaknesses in the government's case until after Hugi was sentenced. Neither is there any allegation that, prior to sentencing, new counsel failed to advise Hugi regarding these potential defenses." Id. at *12. The judge granted a certificate of appealability limited to the ineffective-assistance issue, observing that the substantive contentions Hugi sought to raise are not of constitutional dimension and therefore may not be raised on appeal under 28 U.S.C. § 2253(c)(1)(B)(2). See Young v. United States, 124 F.3d 794, 798–99 (7th Cir.1997).

We may add issues to a certificate of appealability, see Sylvester v. Hanks, 140 F.3d 713 (7th Cir.1998), and Hugi asks us to add his "jurisdictional" objection. Some jurisdictional shortcomings are constitutional in nature, for Article III and the eleventh amendment set limits to the duties Congress may assign to the courts; other jurisdictional deficits are just the result of statutory limitations; but the contention Hugi wants to advance is not "jurisdictional" in either sense. Subject-matter jurisdiction in every federal criminal prosecution comes from 18 U.S.C. § 3231, and there can be no doubt that Article III permits Congress to assign federal criminal prosecutions to federal courts. That's the beginning and the end of the "jurisdictional" inquiry. Lawyers and judges sometimes refer to the interstate-commerce element that appears in many federal crimes as the "jurisdictional element," but this is a colloquialism—or perhaps a demonstration that the word "jurisdiction" has so many different uses that confusion ensues. Kanar v. United States, 118 F.3d 527, 529–30 (7th Cir.1997).

A link to interstate commerce may be essential to Congress's substantive authority, see United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), but the

existence of regulatory power differs from the subject-matter jurisdiction of the courts. *United States v. Martin*, 147 F.3d 529 (7th Cir.1998), clarifies this point by holding that proof of an interstate transaction is no different from proof of any other element of a federal crime. "[T]he nexus with interstate commerce, which courts frequently call the 'jurisdictional element,' is simply one of the essential elements of [the offense]. Although courts frequently call it the 'jurisdictional element' of the statute, it is 'jurisdictional' only in the shorthand sense that without that nexus, there can be no federal crime .... It is not jurisdictional in the sense that it affects a court's subject matter jurisdiction, *i.e.*, a court's constitutional or statutory power to adjudicate a case, here authorized by 18 U.S.C. § 3231." 147 F.3d at 531–32 (citations omitted). *Martin* adds that, "once a defendant pleads guilty in '[a] court which has jurisdiction of the subject matter and of the defendant, as did the court in the instant case,' the court's judgment cannot be assailed on grounds that the government has not met its burden of proving 'so-called jurisdictional facts.'" *United States v. Hoyland*, 264 F.2d 346, 352–53 (7th Cir.1959); *La Fever v. United States*, 279 F.2d 833, 834 (7th Cir.1960). Even if the government fails to establish the connection to interstate commerce, the district court is not deprived of jurisdiction to hear the case." 147 F.3d at 532. See also, e.g., *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1009–12, 140 L.Ed.2d 210 (1998). Hugi pleaded guilty and admitted all of the elements of the offense. No more need be said to demonstrate that the district judge's limitation on the certificate of appealability was proper.

Hugi's contention that Foran furnished ineffective assistance goes nowhere unless Hugi can persuade us to ignore his plea agreement, which proclaimed to the court the truth of two propositions that Hugi now says are false: that Pioneer Press used an interstate wire transfer to verify the credit card charge; and that this occurred on July 27, 1989, within the 5–year statute of limitations. Why should we allow Hugi to contend in 1998 that he lied to the court in 1994? For the statements in the plea agree-

ment (whose veracity Hugi reaffirmed in open court during the Rule 11 colloquy) did not take the posture of an *Alford* plea (see *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)), in which the defendant concedes that the prosecutor *could* prove certain facts without conceding that these things happened. This agreement represents, in Hugi's own words, that he committed every element of the offense, and within the statute of limitations. The document is not agnostic about these subjects. If as Hugi now says he did not know for sure in 1994 that an interstate wire communication occurred on July 27, 1989, then he should not have signed his name to a representation that it *did* occur. Courts take the plea process seriously and hold defendants to their representations. *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *United States v. McFarland*, 839 F.2d 1239 (7th Cir.1988).

Still, as the district judge wrote, it is unnecessary to determine whether Hugi's current story should be preferred to his former story, and his attorney blamed for the difference. Hugi waited far too long to open an attack on Foran's assistance. The forfeiture does not lie in his failure to appeal in 1995. Section 2255 is the proper way to raise ineffective-assistance contentions when they require augmentation of the record, as Hugi's do. See *Duarte v. United States*, 81 F.3d 75 (7th Cir.1996); *Guinan v. United States*, 6 F.3d 468 (7th Cir.1993). Hugi needs to undercut the plea agreement and Rule 11 colloquy, which requires extra evidence. But the time to present this evidence was 1995, and the place was the district court. Hugi had 13½ months between plea and sentencing to mull over what he had told the judge. Two-thirds of this time passed after Popuch replaced Foran. If the concessions were improvident, Hugi could have moved to withdraw the plea and go to trial. Ineffective assistance by Foran would have been a "just and fair reason" for withdrawal. Fed.R.Crim.P. 32(e). That course would have entailed risks, to be sure. The information charged a fraud on Victim J. The pseudonym implies that the prosecutor was aware of at least nine other victims, and perhaps

there was also a Victim K. Had Hugi withdrawn his plea in 1994 or 1995, the prosecutor might have added charges concerning other victims (or perhaps more charges concerning Victim J). By accepting all of the benefits of the plea bargain, Hugi forfeited his opportunity to rid himself of the obligations.

Hugi and Popuch had plenty of time during 1995 to explore Foran's tactics. At oral argument Popuch says that he was busy preparing for sentencing, but we doubt that more than a small fraction of his time during the 8½ months Popuch represented Hugi before the sentencing was devoted to Hugi's case; the legwork and deal-making that led to the sentence had been done by Foran. These plea negotiations took four years! Popuch also told us that Hugi did not realize that the plea agreement contained errors until his stay in prison, when "he had a great deal of time on his hands." Maybe, but Hugi had *more* time between plea and sentence than he spent in prison, more than twice as much; and the occasion to think deeply about a guilty plea is beforehand, rather than during the prison sentence. A guilty plea is not a road-show tryout before the "real" contest occurs in the § 2255 proceedings. For all we can tell, Hugi and Foran well knew that the wire-fraud charge to which he pleaded was weak, but it may have seemed an attractive bargain compared to the alternatives.

What Hugi had to do, if he thought that something had gone seriously wrong, was tell the district court in 1995 and face the consequences, which could have included the filing of additional charges. He wants to have the benefits of the plea bargain without taking any risks. That sort of game is not one the criminal justice system tolerates.

AFFIRMED.