**UNITED STATES of America,
Appellee,**

v.

**Kati KARRO, aka "Kathy Karro," aka "Cathay Karro," aka "Kitty M. Karro," aka "K. Karrow," aka "Kity Karro Polli," Defendant–Appellant.**

No. 00–1565.

United States Court of Appeals,
Second Circuit.

Argued April 26, 2001.

Decided July 13, 2001.

**114**

Gregory Cooper, New York, NY, for Appellant.

Vernon Broderick, Assistant United States Attorney, Southern District of New York, (Mary Jo White, United States Attorney, Bonnie B. Jonas, Assistant United States Attorney, on the brief), New York, NY, for Appellee.

Before: JACOBS, PARKER and KATZMANN, Circuit Judges.

## BACKGROUND

KATZMANN, Circuit Judge:

Kati Karro appeals from a judgment of conviction and sentence entered on July 16, 1999, in the United States District Court for the Southern District of New York (Allen G. Schwartz, *Judge*), following her plea of guilty to twelve counts of mail fraud in violation of 18 U.S.C. § 1341. For the reasons stated below, we affirm.

### 1. Indictment and Trial

By superseding indictment filed on November 19, 1998, Karro was charged with various crimes related to identity theft and fraudulent applications for credit cards. Counts One through Three charged her with mail fraud in 1995 and 1996 relating to two fraudulent applications for MBNA America Bank credit cards, one in the name of Shirley Butler, and one using the name and social security number of Sylvia Morris. Counts Four and Five charged the defendant with using assumed names, Shirley Butler and Sylvia Morris, in furtherance of her mail fraud scheme to defraud MBNA in violation of 18 U.S.C. § 1342.[1] Count Six charged another mail fraud count for using Sylvia Morris's name and Social Security number to secure a First USA Bank credit card. Count Seven charged these allegations as a violation of section 1342. Counts Eight through Eleven charged Karro with mail fraud during 1995 and 1996 for obtaining and using a

---

1. This statute provides: "Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address, or name other than his own proper name, shall be fined under this title or imprisoned not more than five years, or both."

credit card account and checks from the Chevy Chase Bank in the assumed name of Shirley Butler and with a false social security number. Count Twelve charged the same as a violation of section 1342. Counts Thirteen through Sixteen charged mail fraud in 1996 for mailing four separate credit card applications to Henri Bendel, the fashion retailer, using false Social Security numbers in the names Shirley Butler, Sylvia Morris, Lauren Hill, and Elizabeth White. Finally, Counts Seventeen through Twenty charged this conduct under section 1342.

Trial commenced on January 5, 1999. The government introduced testimony from a loss prevention manager at Henri Bendel and from two United States postal inspectors. On the second day of trial, Karro pleaded guilty pursuant to a written plea agreement to the twelve counts of mail fraud.

### 2. Guilty Plea

The plea agreement stipulated that the mail fraud counts would be grouped for the purposes of determining the offense level; the base offense level was six subject to a two-level increase for more than minimal planning; the defendant's Criminal History category was I; and the loss resulting from the offense conduct was at least $25,000. The parties agreed that each would reserve the right to offer arguments at sentencing about additional loss amounts and the propriety of a reduction in the offense level for acceptance of responsibility. The agreement was signed on January 6, 1999, by counsel for the government, by the defendant, and by her then-attorney.

That same day the defendant pleaded guilty before the District Court. She attested that she was satisfied with her counsel's representation, had reviewed and understood the charges, understood the rights she was waiving, understood the applicable range of penalties, had discussed the guidelines with her counsel and knew that her guideline range could not be determined until her sentencing proceeding, and had reviewed and fully understood the consequences and terms of the plea agreement, including its binding nature. The defendant averred that she was voluntarily pleading guilty because she was in fact guilty, and then allocuted to the mail fraud offense conduct.

### 3. Motion to Withdraw Guilty Plea

By letter dated January 11, 1999, the defendant, through her then-attorney, informed the District Court that she wished to withdraw her guilty plea and also wanted to have new counsel appointed because her attorney was "to blame" for her plea. The next day, the District Court held a conference during which her attorney, with the defendant's permission, explained that her plea was involuntary because of her psychological condition. The defendant then explained to the court that she wished to replace her attorney because he had not adequately represented her and had worsened her psychological condition by not preventing a prison transfer. The court appointed a new attorney from the Criminal Justice Act panel, whose representation has continued through this appeal.

Through her new attorney, the defendant moved pursuant to Fed.R.Crim.P. 32(e) to withdraw her plea and also to dismiss the indictment. The written motion contended that while the defendant admitted the conduct to which she had allocuted, she could not properly be convicted of mail fraud because she obtained the credit cards through pre-approved direct mail solicitations. Therefore the false information she provided did not cause the cards to be issued and as a result did not directly cause any loss. Furthermore, she

asserted that she had no intent to harm the victims (the lenders), an essential element of mail fraud, because she made the required minimum payments on her accounts up through the time of her arrest and intended to continue to do so. According to the defendant, a "scheme to defraud" chargeable as mail fraud only exists "when the defendant uses the card without the intent to repay." Finally, the defendant urged that the counts of the indictment charging violations of 18 U.S.C. § 1342 should be dismissed as multiplicitous.

After receiving the government's objections, the District Court denied the motion in an unpublished decision, dated June 14, 1999. The court rejected the defendant's contention that proof of intent to fail to repay the accounts was required, citing *United States v. Rossomando,* 144 F.3d 197, 201 (2d Cir.1998), *United States v. Chandler,* 98 F.3d 711, 716 (2d Cir.1996), and *United States v. Dinome,* 86 F.3d 277, 283–84 (2d Cir.1996), for the proposition that "the lender has a right to control its assets and to extend credit based upon full and correct information," and the lender "has been defrauded and exposed to risk where a borrower supplies false information, regardless of whether the borrower intends to cause an actual financial loss." The court pointed out that, as a factual matter, it is not true that the defendant only responded to pre-approved direct mail solicitations or that the defendant did not provide any other false information besides a name and Social Security number. In any event, the court concluded that under the Second Circuit precedent it had cited, mail fraud can be charged based simply upon a borrower's provision of a false identity, because while the lenders may have decided to extend credit to the named borrowers, they had not intended to extend credit to Kati Karro—and thereby they were deprived of their ability to manage risk and expend their assets based upon accurate information about the identity of the prospective borrower.

### 4. Sentencing

At a sentencing hearing on June 24, 1999, the judge gave notice, pursuant to *Burns v. United States,* 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), that he was considering an upward departure. The rationale was that the Presentence Investigation Report ("PSR") indicated that the defendant "was involved in a fraud industry . . . dating back to 1988 and continuing all the way through the years of the 1990s." An additional reason offered by the District Court was that her case may well have fallen outside the heartland of fraud cases and included factors not taken into account by the Sentencing Commission because her use of the identities of other individuals had an impact not only on the "credit industry" but also "invade[d] the privacy and potentially affect[ed] the credit of [these] individuals." Sentencing was adjourned until July 16, 1999.

At sentencing, the defendant and her lawyer presented arguments against the upward departure. The defendant conceded that she assumed others' identities without permission and without considering what effect that may have on the victims, but argued that the victims of her identity theft were not injured as a result of her actions. Pursuant to a provision of the plea agreement, the government took no position on the contemplated upward departure. After reviewing the offense conduct and the highlights of the government's investigation, the court issued several oral rulings. First, the court declined to decrease the defendant's offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, finding that defendant did not voluntarily withdraw from criminal activity, made false statements to

the Probation Department during the pretrial period, continued to use credit cards issued in other people's names, and did not voluntarily pay any restitution. Next, the court declined the government's request to increase the amount of the loss calculation. The amount of the loss stipulated to in the plea agreement resulted in an increase of four offense levels pursuant to U.S.S.G. § 2F1.1. The offense level was also increased by two because of more than minimal planning, giving the defendant a total offense level of twelve. The parties had agreed that her Criminal History Category was I. The District Court then upwardly departed, finding that "the loss calculation does not here reflect the enormity of Ms. Karro's crimes" because it only takes into account "the losses sustained by the credit card companies," and not the harms caused by identity theft to the individuals whose identities and Social Security numbers were used. The court relied upon Application Note 11 to Section 2F1.1, which allowed a departure where the conduct risked reasonably foreseeable substantial nonmonetary harm, and also referenced Congress's awareness of the problem of identity theft as shown by its passage of the Identity Theft and Assumption Deterrence Act of 1998 ("ITADA"), Pub.L. No. 105–318, 112 Stat. 3007, largely codified at 18 U.S.C. § 1028 and 28 U.S.C. § 994. The court found that "[t]here is no question in my mind that each and every time Ms. Karro entered into a transaction using someone else's name and/or Social Security number, she put into issue their credit rating and, by extension, their mental well-being and emotional state, as well as the financial security of these people." Accordingly, the court departed upward five levels from the guidelines range of 10–16 months to a range of 24–30 months, and sentenced the defendant to the top of that range.

Karro now appeals on the grounds that the district court erred in denying her motion to withdraw her guilty plea and in upwardly departing.

## DISCUSSION

### 1. Withdrawal of the Guilty Plea

"As a general matter, a defendant has no absolute right to withdraw [her] plea of guilty." *United States v. Avellino*, 136 F.3d 249, 261 (2d Cir.1998). A district court's denial of a motion to withdraw a guilty plea is reviewed for abuse of discretion. *See United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001). When a motion to withdraw a plea of guilty is made before the imposition of sentence, the court "may" grant the motion if "the defendant shows any fair and just reason." Fed.R.Crim.P. 32(e); *see also United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir.1997). The district court should examine the amount of time elapsed between the plea and the subsequent motion to withdraw, *see United States v. Grimes*, 225 F.3d 254, 259 (2d Cir.2000), and whether the defendant's motion to withdraw his plea asserted his innocence, *see United States v. Rodriguez*, 968 F.2d 130, 141 (2d Cir.1992); Fed.R.Crim.P. 32, Adv. Comm. Notes (1983 amendment), as well as giving "due regard to any prejudice the government might suffer as a result." *Hernandez*, 242 F.3d at 112.

In this case, the District Court plainly did not abuse its discretion by disallowing the withdrawal of the guilty plea because the defendant's assertion that her conduct did not constitute mail fraud was unfounded. "Proof of fraudulent intent, or the specific intent to harm or defraud the victims of the scheme, is an essential component of the 'scheme to defraud' element" of the mail fraud statute. *United States v. Walker*, 191 F.3d 326, 334 (2d Cir.1999); *accord In re Seizure of All Funds in Ac-*

counts in *Names Registry Pub. Inc.*, 68 F.3d 577, 580 (2d Cir.1995) ("An essential element of mail fraud, and the element that is in dispute here, is intent to defraud. In order to establish that the defendant acted with an intent to defraud, the government must show that some actual harm or injury was contemplated by the schemer.") (internal quotation marks omitted). "Intent to harm, however, can be inferred from exposure to potential loss." *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir.1996). As the District Court correctly determined, under *United States v. Rossomando*, 144 F.3d 197 (2d Cir.1998), *United States v. Dinome*, 86 F.3d 277 (2d Cir. 1996), and *Chandler*, there was no defect in indictment or plea allocution's coverage of the intent to defraud element. Stated in terms relevant to Karro's case, *Rossomando*, *Chandler* and *Dinome* establish that sufficient intent to inflict harm can be found from the intentional withholding of information from a lender which lowers the value of the transaction due to the lender's lack of information pertinent to the accurate assessment of the risk it faces and the propriety of extending credit to that particular individual, and because of the increased expense and difficulty of any necessary bill collection efforts. Because this intent is sufficient, it is irrelevant whether the borrower intended in good faith to repay the loan. *See Rossomando*, 144 F.3d at 201 ("[W]here a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank, the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank—i.e., to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the

defendant."); *see also Chandler*, 98 F.3d at 716; *Dinome*, 86 F.3d at 280, 284. Accordingly, the defendant's contention that she lacked the intent to fail to repay the money she charged on the fraudulently-obtained credit cards is irrelevant to her guilt.

■ Since the defendant conceded both at her plea allocution and in her papers seeking withdrawal of the guilty plea that she had intentionally performed the offense conduct charged in the indictment, and since the District Court properly determined that the defendant had not advanced a legally cognizable defense to the mail fraud charges, it was not an abuse of discretion to hold the defendant to her guilty plea. *Cf. Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (noting society's "fundamental interest in the finality of guilty pleas") (citing *United States v. Timmreck*, 441 U.S. 780, 784, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979)).

## 2. The Upward Departure

On October 30, 1998, Congress enacted the ITADA. That act, *inter alia*, directed the Sentencing Commission to "review and amend the Federal sentencing guidelines and the policy statements of the Commission, as appropriate, to provide an appropriate penalty for each offense under section 1028 of title 18, United States Code, as amended by this Act." Pub.L. No. 105–318, § 4(a), 112 Stat. 3007, 3009; *see also* 28 U.S.C. § 994 (notes, 1998 amendment). In addition, section 4(b) of the ITADA provided:

FACTORS FOR CONSIDERATION.— In carrying out subsection (a), the United States Sentencing Commission shall consider, with respect to each offense described in subsection (a)—

(1) the extent to which the number of victims (as defined in section 3663A(a) of

title 18, United States Code) involved in the offense, including harm to reputation, inconvenience, and other difficulties resulting from the offense, is an adequate measure for establishing penalties under the Federal sentencing guidelines; (2) the number of means of identification, identification documents, or false identification documents (as those terms are defined in section 1028(d) of title 18, United States Code, as amended by this Act) involved in the offense, is an adequate measure for establishing penalties under the Federal sentencing guidelines; (3) the extent to which the value of the loss to any individual caused by the offense is an adequate measure for establishing penalties under the Federal sentencing guidelines; (4) the range of conduct covered by the offense; (5) the extent to which sentencing enhancements within the Federal sentencing guidelines and the court's authority to sentence above the applicable guideline range are adequate to ensure punishment at or near the maximum penalty for the most egregious conduct covered by the offense;

\*    \*    \*    \*    \*    \*

[and]

(8) any other factor that the United States Sentencing Commission considers to be appropriate.

*Id.* § 4(b), 112 Stat. at 3009–10.

As of the date of the defendant's sentencing, July 16, 1999, the Sentencing Commission had not yet implemented this Congressional directive. On appeal, the defendant contends that this failure to act indicates that "in fact the Commission has specifically forbidden departures based upon ... features relating to identity theft." According to the defendant, it was error for the District Court to conclude that the Sentencing Commission had not considered the effects of identity theft because the Commission was obviously aware of the ITADA and yet "chose not to change the guidelines under 2F1.1"

This argument does not account for a recent amendment to the guidelines. Section 2F1.1(b)(5) now provides:

If the offense involved—

\*    \*    \*    \*    \*    \*

(C) (i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification; or (ii) the possession of 5 or more means of identification that unlawfully were produced from another means of identification or obtained by the use of another means of identification ... increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

The Commission's Commentary to section 2F1.1 states that:

Subsection (b)(5)(C) implements the directive to the Commission in section 4 of the Identity Theft and Assumption Deterrence Act of 1998, Public Law 105–318.... This subsection provides a minimum offense level of level 12, in part, because of the seriousness of the offense.... The minimum offense level also accounts for the non-monetary harm associated with these types of offenses, much of which may be difficult or impossible to quantify (e.g., harm to the individual's reputation or credit rating, inconvenience, and other difficulties resulting from the offense). The legislative history of the Identity Theft and Assumption Deterrence Act of 1998 indicates that Congress was especially concerned with providing increased punishment for this type of harm.

U.S.S.G. § 2F1.1, cmt.

In light of these changes to the guidelines, it is untenable to maintain that the Commission's delay in implementing the

120

ITADA indicated a belief that the previous fraud guidelines adequately addressed Congress's concerns as embodied in the ITADA.

■ That said, we still must determine whether the upward departure was appropriate under the guidelines in place when the defendant was sentenced.[2] At all relevant times, the Application Notes to section 2F1.1 have provided "[i]n cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted. Examples may include the following: ... the fraud caused or risked reasonably foreseeable, substantial non-monetary harm" U.S.S.G. § 2F1.1, app. note 11(a) (1999).[3] The District Court's description of the reasons for the upward departure specifically referenced this Application Note.

In its introduction to the guidelines, the Sentencing Commission stated that it "intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. Ch. 1, pt. A, subpt. 4(b). By statute, a district court may sentence outside the prescribed guideline range if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); see U.S.S.G. § 5K2.0; see also, e.g., United States v. Khan, 53 F.3d 507, 518 (2d Cir.1995).

■ On appeal, we review the propriety of a departure under the following standards:

We review the district court's departure for an abuse of discretion. In so doing, we generally apply a three-part analysis: first, we determine de novo whether this factor is related to the offense and not adequately considered by the Sentencing Commission; second, we determine whether the district court's departure is supported by findings of fact; last, we ascertain whether the district court adequately has explained how it determined the extent of its departure.

United States v. Malpeso, 115 F.3d 155, 169 (2d Cir.1997) (citations omitted). Thus, we review de novo a district court's conclusion that a factor is a permissible basis for departure, see Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), review factual findings for clear error, see, e.g., United States v. Broderson, 67 F.3d 452, 458 (2d Cir.1995), and "review the resulting sentence for reasonableness." Id.

**2.** U.S.S.G. § 1B1.11(a) provides that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced," and subsection (b) provides that "[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." For these purposes, the "last date of the offense, as alleged in the indictment, is the controlling date." United States v. Broderson, 67 F.3d

452, 456 (2d Cir.1995). The defendant was sentenced in 1999, and the twenty counts of the superseding indictment covered offense conduct continuing through 1996. In pertinent part, section 2F1.1 and the accompanying application notes were identical during these time periods, and therefore we need not decide which date should be used to determine the applicable guidelines.

**3.** A 1998 amendment to the guidelines redesignated the former Application Note 10 as Application Note 11.

In this case, the District Court's upward departure was based on what could be called an "encouraged" factor. *See Koon,* 518 U.S. at 94–95, 116 S.Ct. 2035; *see also Broderson,* 67 F.3d at 458 (discussing *United States v. Rivera,* 994 F.2d 942 (1st Cir.1993) (Breyer, C.J.)). As discussed, an Application Note to the relevant guideline specifically suggests that a sentencing court might depart upward where the fraud "risked reasonably foreseeable, substantial non-monetary harm." U.S.S.G. § 2F1.1, app. note 11(a); *see generally Koon,* 518 U.S. at 92–93, 116 S.Ct. 2035 (quoting 18 U.S.C. § 3553(b)) (sentencing courts can use the "sentencing guidelines, policy statements, and official commentary of the Sentencing Commission" to determine whether a factor may justify departure). "If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account." *Koon,* 518 U.S. at 96, 116 S.Ct. 2035.

■ We agree with the District Court that prior to the changes to the guidelines occasioned by the passage of the ITADA, the guidelines did not take into account the type of non-monetary harms that identity theft like Karro's risks imposing on the individuals whose identities are stolen. Under section 2F1.1, the base offense level is determined by calculating the dollar value of the "loss," which is defined in accordance with the principles in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). *See* U.S.S.G. § 2F1.1, app. note 8 (1999). Thus, " '[l]oss' means the value of the property taken, damaged, or destroyed." *Id.,* § 2B1.1, app. note 2 (1999). "As in theft cases, loss is the value of the money, property, or services unlawfully taken." *Id.,* § 2F1.1, app. note 8 (1999). Prior to the implementation of the ITADA, section 2F1.1(b)(2)-(6) provided a number of criteria by which the sentencing court could enhance the

base offense level, but none of them specifically took account of the types of harms identified by the District Court in this case. *See United States v. Akindele,* 84 F.3d 948, 952–55 (7th Cir.1996) (approving upward departure in identity theft case because Sentencing Commission did not account for the substantial non-monetary harm suffered by these individual victims, including being "caused a great deal of worry and inconvenience," having "credit histories ... tarnished," and having "criminal records ... erroneously created in their names"); *cf.* S. Rep. 105–274 (1998) (reporting that "[o]n an individual level, the 'human' cost of identity theft can be quite substantial. These costs include emotional costs, as well as various financial and/or opportunity costs," and that the ITADA therefore directed "the [Sentencing] Commission [to] consider the extent that 'harm to reputation, inconvenience, and other difficulties resulting from the offense' " should be accounted for in sentencing). Accordingly, we conclude that the District Court properly identified the risk of non-monetary harms associated with identity theft to be a permissible basis for an upward departure.

■ Nor are we persuaded by the defendant's other contentions regarding the upward departure. For one, the defendant asserts that there was no evidence before the District Court of actual non-monetary harm to any victims, and that this "potential [harm], with no other evidence to support it, is insufficient as a matter of law to justify the upward departure imposed herein." No individual victims testified at the defendant's aborted trial. The government did not introduce any victim testimony at the sentencing because the plea agreement barred it from requesting an upward departure on this basis. The victim impact analysis in the PSR only covers the impact on the affected financial institutions, not the individuals. However, the departure was nonethe-

**122**

less appropriate. The Application Notes to the fraud guideline specifically encourage an upward departure where the fraud "caused *or risked* reasonably foreseeable, substantial non-monetary harm." U.S.S.G. § 2F1.1, app. note 11(a) (emphasis added). The offense conduct detailed in the PSR and allocuted to by the defendant—*inter alia*, the use of the names and social security numbers of multiple individuals, at least one of whom was quite elderly, to open and obtain money from credit card accounts at banks and a department store—clearly gave the District Court a sufficient basis to find a risk of substantial harm to those individuals.

■ Although the defendant's brief does not specifically take issue with the magnitude of the departure, we pause briefly to note that the five-level departure was considerable but was not so excessive that it should be vacated. If the defendant had been sentenced under the post-ITADA guidelines, she would have received a two-level increase in her offense level pursuant to section 2F1.1(b)(5)(C), discussed above, because she engaged in the "unauthorized . . . use" of the victims' identities to obtain credit accounts in their names. Even after employing this new statutory enhancement, a sentencing court would now still have discretion to upwardly depart if it found that the actual or potential harm from identity theft was "present to an exceptional degree," *Koon,* 518 U.S. at 96, 116 S.Ct. 2035; *see also* § 2F1.1, app. note 16 ("In a case involving unlawfully produced or unlawfully obtained means of identification, an upward departure may be warranted if the offense level does not adequately address the seriousness of the offense.").[4] Thus, a two-level upward de-

parture is not the upper limit under current law and does not set any kind of strict benchmark with which to measure reasonableness. Given the evidence before the District Court of the great potential to harm a number of innocent victims, we do not find the five-level departure "unreasonable." 18 U.S.C. § 3742(f)(2).

*CONCLUSION*

Having failed to present a cognizable defense to the mail fraud charges, the defendant had no entitlement to withdraw her guilty plea. Furthermore, the District Court did not abuse its discretion in departing upward to account for the risk of non-monetary harm to the victims of the defendant's identity theft. Therefore, for the reasons set forth above, the judgment of conviction and sentence are affirmed.

---

4. The current Application Note 16 to section 2F1.1 gives the following example of when such an upward departure may be appropriate: "The defendant produced or obtained numerous means of identification with re- spect to one individual and essentially assumed that individual's identity." The defendant's theft and assumption of Lauren Hill's identity could support a further upward departure on this basis.